## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PINKTOE TARANTULA LIMITED, *et al.*,[1] | Case No. 18-10344 (KJC ) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, 503 AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby move the Court (this "**Motion**")[2] pursuant to sections 105, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014, of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2002-1(b), 4001-2, 9006-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an interim order (the "**Interim DIP Order**"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"):

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are:  Pinktoe Tarantula Limited (8609), Desert Blonde Tarantula Limited (7124), and Red Rump Tarantula Limited (0288).

[2]    Unless otherwise noted herein, all capitalized terms used in this Motion shall have the meanings ascribed to such terms herein, regardless of whether the definitions of such terms appear later in this Motion than the first use of such term.  Capitalized terms used in this Motion but not otherwise defined herein shall have the meanings ascribed to them in the Interim DIP Order.

(1) authorizing the Debtors to obtain senior secured postpetition financing on a priming, superpriority basis (the "**DIP Facility**"; and the loan under the DIP Facility, the "**DIP Loan**") pursuant to the terms and conditions of the DIP Orders and that certain Senior Secured Debtor In Possession Term Loan and Security Agreement (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**," (a copy of which is attached hereto as **Exhibit B**) and together with all agreements, documents, instruments and certificates executed, delivered, or filed in connection therewith, as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof, collectively, the "**DIP Loan Documents**"), by and among Pinktoe Tarantula Limited, Desert Blonde Tarantula Limited, and Red Rump Tarantula Limited, as Debtors (the "**Debtors**") and Three14 Limited, as lender (the "**DIP Lender**"), providing for, *inter alia*, (i) a new money senior secured priming superpriority term loan facility, providing for the borrowing of term loans in accordance with the Approved Budget (as defined in the Interim DIP Order), a copy of which is attached hereto as **Exhibit C**, in an aggregate maximum principal amount not to exceed $410,000.00, which consists of an initial loan of $160,000.00 upon entry of the Interim DIP Order, with the remaining principal amount available upon entry of the Final DIP Order;

(2) authorizing the Debtors to execute, deliver to the DIP Lender, and perform under the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be necessary or desirable in connection with the DIP Loan Documents;

(3) authorizing and directing the Debtors to incur and pay all DIP Obligations (as defined in the Interim DIP Order);

(4) granting to the DIP Lender, subject to the Carve-Out (as defined in the Interim DIP Order) valid, enforceable, non-avoidable, automatically and fully perfected liens on and security interests in all DIP Collateral (as defined in the Interim DIP Order), including, without limitation, all Cash Collateral (as defined in the Interim DIP Order) to secure the DIP Obligations, which liens and security interests shall be subject to the rankings and priorities set forth herein;

(5) granting to the DIP Lender allowed superpriority administrative expense claims in respect of all DIP Obligations, subject to the Carve-Out, as set forth in the Interim DIP Order;

(6) authorizing the Debtors' use of the proceeds of the DIP Facility and Cash Collateral pursuant to the Approved Budget, the DIP Orders and the DIP Loan Documents;

(7) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and the DIP Loan Documents, and providing for the immediate effectiveness of the DIP Orders; and

(8) scheduling a final hearing (the "**Final Hearing**") to consider entry of a final order authorizing the relief requested in the DIP Motion on a final basis, and approving the form of notice with respect to the Final Hearing, which order shall be in form and substance and on terms satisfactory in all respects to the Debtors and the DIP Lender (the Final DIP Order).

   In further support of this Motion, the Debtors respectfully state as follows:

## Status of the Case

1.      On February 17, 2018 (the "**Petition Date**"), the Debtors commenced these chapter 11 cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these Chapter 11 Cases.

## Jurisdiction, Venue and Statutory Predicates

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory bases for the relief requested herein are sections 105, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b), 4001-2, 9006-1, and 9013-1.

3

## Background

6.      The Debtors own and operate four retail stores in New York, California, and Nevada, primarily selling Charlotte Olympia brand luxury shoes and accessories.[3]  The Debtors occupy the stores under leases with various landlords.  The Debtors are headquartered in New York City and have 21 full and part-time employees.

7.      The Debtors have filed these chapter 11 cases to effectuate an orderly liquidation of their assets.

8.      A detailed factual background of the Debtors' businesses and operations, as well as the events precipitating the commencement of the Chapter 11 Cases, is more fully set forth in the *Declaration of William Kaye in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## Relief Requested

9.      The Debtors seek entry of the Interim DIP Order and, pending the Final Hearing, the Final DIP Order, in each case: (a) authorizing the Debtors to obtain senior secured priming[4] superpriority postpetition financing on a priming superpriority basis; (b) authorizing the Debtors to execute, deliver, and perform under the DIP Credit Agreement and the other DIP Loan Documents; (c) authorizing and directing the Debtors to incur and pay all DIP Obligations; (d) granting to the DIP Lender, subject to the Carve-Out, valid, enforceable, non-avoidable, automatically and fully perfected liens on and security interests in all DIP Collateral; (f) granting

---

[3]   Debtor Red Rump Limited previously owned and operated a store in Florida, which closed prior to the Petition Date.

[4] While the Debtors have no known secured debt, they are requesting that the liens be granted on a priming basis in the event that creditor(s) assert secured claim(s).

ATL 22637303v5

to the DIP Lender allowed superpriority administrative expense claims; (g) authorizing the Debtors' use of proceeds of the DIP Facility and Cash Collateral; (h) vacating and modifying the automatic stay; (i) scheduling the Final Hearing to consider entry of the Final DIP Order and approving the form of notice with respect to the Final Hearing; and (j) granting related relief.

### Debtors' Capital Structure and Goals in these Cases

10.     As of the Petition Date, the Debtors have no known secured debt.  However, the Debtors have been losing money for several years, and therefore their cash position is presently very low.

11.     During these cases, the Debtors intend to sell their remaining inventory, close their stores, and propose a liquidating chapter 11 plan to effectuate the distribution of the inventory proceeds.  In order to effectuate those goals, the Debtors will require cash to fund their liquidation.

12.     As such, the Debtors submit that the DIP Financing, which is being made on favorable, below-market terms by a non-debtor affiliate, will effectuate the goals of these cases.

### The DIP Financing

**A.  Summary**

13.     The Debtors have obtained the DIP Facility from the DIP Lender.  The DIP Facility, more fully described herein, will provide the Debtors with $410,000.00 of funding to support their operations and liquidation costs in these Chapter 11 Cases.  The DIP Facility represents the best source of financing available to the Debtors under the circumstances, resulting in terms that the Debtors submit are reasonable and appropriate to meet the Debtors' financing needs during these Chapter 11 Cases.  The DIP Facility will provide the Debtors with sufficient liquidity to fund these Chapter 11 Cases.

ATL 22637303v5

14.     The proposed DIP Facility is a multiple-draw superpriority senior secured priming debtor-in-possession term loan facility, consisting of new money loans in an aggregate principal amount not to exceed $410,000.00, with an initial draw of $160,000.00 (the "**Initial Draw**"). Interest accrues on the DIP Loan at the rate of 5% per annum, well below prevailing market rates for DIP financing offered by other DIP lenders, and without origination fees or other fees that would typically be seen in a facility of this nature.

**B. The Debtors' Liquidity Needs**

15.     The Debtors' need to use Cash Collateral on an interim basis and to obtain credit pursuant to the DIP Facility as provided for herein on an interim basis is urgent and necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties-in-interest, and to enable the Debtors to administer and preserve the value of their estates. The ability of the Debtors to maintain business relationships with their vendors, pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  Without the ability to access the Interim Financing (as defined in the Interim DIP Order) and the DIP Facility and the authority to use Cash Collateral, the Debtors, their estates, and their creditors would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

16.     Accordingly, absent interim approval of the DIP Facility, the Debtors would have no choice but to cease operations and liquidate their assets for a fraction of what could be garnered through the orderly wind-down proposed by the Debtors.  An immediate liquidation would result in a deterioration of value for creditor constituencies.  In addition, and as discussed

more fully below, after exploring alternate DIP financing options with the assistance of their advisors, the Debtors believe that the proposed DIP Facility is the only postpetition financing alternative available under all of the circumstances.  The proposed DIP Facility provides the best path forward under the circumstances to address the Debtors' immediate liquidity needs, to fund these Chapter 11 Cases, and to provide a clear path toward an orderly wind-down and that preserve value for creditors.

### C.  Alternative Sources of Financing Not Available

17.     Given the size of the proposed facility, and the Debtors' current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than those provided under the DIP Facility and the DIP Loan Documents.  The Debtors have been unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors also have been unable to obtain sufficient credit (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Postpetition financing is not otherwise available without granting the DIP Lender:  (1) perfected priming security interests in and liens on all of the Debtors' existing and after-acquired assets with the priorities set forth in the Interim DIP Order; (2) superpriority claims and liens; and (3) the other protections set forth in the Interim DIP Order.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time and is in the best interest of all of their stakeholders.

7

18.     The Debtors have determined in the exercise of their business judgment that a DIP financing transaction with the DIP Lender presents the best, least expensive, and most expeditious option to finance the Debtors through these Chapter 11 Cases.  The Debtors do not believe any other DIP financing, on any better terms, would be reasonably available given the realities imposed by the Debtors' current circumstances.

## Terms and Conditions of the DIP Facility

### A.  Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2

19.     The following chart contains a summary of the essential terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2.[5]

| BANKRUPTCY CODE/LOCAL RULE | SUMMARY OF MATERIAL TERMS |
| --- | --- |
| **Debtors**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | Pinktoe Tarantula Limited, Desert Blonde Tarantula Limited, and Red Rump Tarantula Limited., in their capacities as debtors and debtors-in-possession.<br><br>*See* Interim DIP Order, p. 1–2; DIP Credit Agreement, preamble. |
| **DIP Lender**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | Three14 Limited<br><br>*See* Interim DIP Order, pp. 1–2; DIP Credit Agreement, preamble. |
| **Commitment**<br><br>**Bankruptcy Rule 4001(c)(1)(B)**<br><br>**Local Rule 4001-2(a)(ii)** | The DIP Facility shall include loans to be advanced and made available to the Debtor in the aggregate maximum principal amount not to exceed $410,000.00, with an Initial Draw of $160,000.00 upon entry of the Interim DIP Order.<br><br>*See* Interim DIP Order, p. 2; DIP Credit Agreement, § 2.1. |

---

[5] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined shall have the meanings ascribed to them in the DIP Loan Documents.

| **BANKRUPTCY CODE/LOCAL RULE** | **SUMMARY OF MATERIAL TERMS** |
|---|---|
| **Term**<br><br>**Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B)**<br><br>**Local Rule 4001-2(a)(ii)** | All DIP Obligations (as defined in the Interim DIP Order) will be due and payable in full in cash on the earliest of: (a) an Event of Default as defined in the DIP Credit Agreement; (b) the first business day that is three months after the entry of the Interim DIP Order; (c) confirmation of a chapter 11 plan in the Chapter 11 Cases; (d) conversion of the Chapter 11 Cases to chapter 7; (e) dismissal of the Chapter 11 Cases; or (f) appointment of a chapter 11 trustee in the Chapter 11 Cases.<br><br>*See* Interim DIP Order, p. 21; DIP Credit Agreement, § 3.1. |
| **Use of DIP Facility and Cash Collateral**<br><br>**Bankruptcy Rule 4001(b)(1)(B)(ii)**<br><br>**Local Rule 4001- 2(a)(ii)** | Proceeds of the DIP Loan will be used only for the following purposes, in each case, in accordance with and subject to the Approved Budget then in effect: (i) general corporate and working capital purposes including funding of the Carve-Out and other expenses provided in, and subject to in all respects, the Approved Budget; (ii) the payment of costs of administration of these Chapter 11 Cases; and (iii) the payment of the fees, costs and expenses related to the DIP Facility.<br><br>*See* Interim DIP Order, pp. 15–16. |
| **Fees**<br><br>**Bankruptcy Rule 4001(c)(1)(B)**<br><br>**Local Rule 4001-2(a)(ii)** | The Debtors shall be obligated to pay all of the DIP Lender's reasonable fees and expenses, including attorneys' fees and costs, incurred in connection with the DIP Credit Agreement and the DIP Loan.<br><br>*See* Interim DIP Order, pp. 9–10, 24; DIP Credit Agreement, § 2.4. |
| **Interest Rates**<br><br>**Bankruptcy Rule 4001(c)(1)(B)**<br><br>**Local Rule 4001-2(a)(ii)** | 5.00% per annum, payable on a monthly basis.<br><br>Default Interest: 2.00% per annum.<br><br>*See* DIP Credit Agreement, § 2.3. |
| **Conditions of Borrowing**<br><br>**Bankruptcy Rule 4001(c)(1)(B)**<br><br>**Local Rule 4001- 2(a)(ii)** | Usual and customary for transactions of this type and others determined to be appropriate by the DIP Lender and agreed to by the Debtor, including, without limitation, the following:<br><br>All documentation relating to the DIP Facility shall be in form and substance satisfactory to the DIP Lender and all such documentation required to be executed shall be executed.<br><br>The DIP Order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than, as to the Interim DIP Order, by the Final DIP Order) absent the prior written consent of Lender.<br><br>The DIP Lender shall have a valid and perfected lien on and security interest in the DIP Collateral on the basis and with the priority set forth herein.<br><br>The Debtors must notify the DIP Lender, promptly after the Debtor obtain |

9

| BANKRUPTCY CODE/LOCAL RULE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | knowledge thereof, of (i) any default or Event of Default; (ii) the commencement of any action, suit or other proceeding against, or any demand for arbitration with respect to, the Debtors; (iii) the occurrence or existence of any default (or claimed default) by the Debtors relating to the DIP Credit Agreement or the DIP Loan; or (iv) any other event or transaction which has or could reasonably be expected to have a material adverse effect.<br><br>The Debtors must maintain and preserve all rights (including all rights related to Intellectual Property), franchises, and other authority adequate for the conduct of its business; maintain its properties, equipment and facilities in good order and repair; conduct its business in an orderly manner without voluntary interruption; and maintain and preserve its existence.<br><br>In addition to the insurance required by the Loan Documents with respect to the DIP Collateral, the Debtors must maintain with its current insurers or with other financially sound and reputable insurers having a rating of at least A- or better by Best's Ratings, a publication of A.M. Best Company, (i) insurance with respect to its properties and business against such casualties and contingencies of such type (including product liability, workers' compensation, larceny, embezzlement or other criminal misappropriation insurance) and in such amounts and with such coverages, limits and deductibles as is customary in the business of the Debtors (ii) marine cargo coverage, in such amounts and with such coverages, limits and deductibles as is customary in the business of the Debtors , and (iii) business interruption insurance, in an amount approved by the DIP Lender.<br><br>The Debtors must permit representatives of Lender from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default or Event of Default exists) upon reasonable prior notice to the Debtors to: visit and inspect properties of the Debtors; inspect, audit and make extracts from the Debtors' books and records; and discuss with its officers, employees and independent accountants the Debtors' financial conditions, business prospects and results of operations.<br><br>The Debtors must pay and discharge all Taxes (and other charges the non-payment of which could result in a lien on the Debtors' assets) in accordance with the requirements of the Bankruptcy Code to the extent permitted under the DIP Orders, and, if requested by the DIP Lender, shall provide proof of payment or, in the case of withholding or other employee taxes, deposit of payments required by applicable law. The Debtors shall deliver to the DIP Lender copies of all tax returns (and amendments thereto) promptly after the filing thereof.<br><br>The Debtors must keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with GAAP reflecting all its financial transactions.<br><br>The Debtors must comply with all laws relating to the Debtors, the conduct of its business and the ownership and use of its assets, including ERISA, all |

10

| BANKRUPTCY CODE/LOCAL RULE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | Environmental Laws, OSHA, the FLSA, and all other laws regarding the collection, payment and deposit of taxes, and shall obtain and keep in full force and effect any and all governmental and regulatory approvals necessary to the ownership of its properties or the conduct of its business and shall promptly report any non-compliance to the DIP Lender.<br><br>Upon the demand of the DIP Lender, the Debtors must promptly reimburse the DIP Lender for all sums expended by the DIP Lender which constitute expenses related to the DIP Facility, and the Debtors authorize and approve all DIP Loan by the DIP Lender in payment of items constituting such expenses.<br><br>The Debtors must promptly (and in any event within two days) after sending thereof, deliver, or cause to be delivered, to the DIP Lender copies of all written reports given by or on behalf of the Debtors to any committee.<br><br>*See* DIP Credit Agreement, § 5.1, 7.1–7.9. |
| **Budget**<br><br>**Bankruptcy Rule 4001 (c)(1)(B)**<br><br>**Local Rule 4001-2(a)(ii)** | As a condition to closing, the Debtors shall have furnished the Approved Budget to the DIP Lender. The Approved Budget shall be reasonable and prepared on a reasonable basis and in good faith by the Debtors and is based on reasonable assumptions based on the best information available to the Debtors, and the Debtors are not aware of any facts or information that would lead any of them to believe that the Approved Budget is incorrect or misleading in any material respect.<br><br> *See* Interim DIP Order, p. 17; DIP Credit Agreement, § 6.2. |
| **Liens and Priorities**<br><br>**Bankruptcy Rule 4001(c)(I)(B)(i)**<br><br>**Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii)** | "**DIP Collateral**" means all personal and real property of Borrowers, including all of the following property and interests in property of Borrowers, whether now owned or existing or hereafter created, acquired or arising and wheresoever located: : (i)  all cash and cash equivalents; (ii) all funds in any deposit account, securities account or other account of the Debtors and all cash and other property deposited therein or credited thereto from time to time; (iii) all accounts and other receivables (including for the avoidance of doubt all intercompany receivables owed to the Debtors); (iv) all contract rights; (v) all instruments, documents and chattel paper; (vi) all securities (whether or not marketable); (vii) all goods, equipment, inventory and fixtures; (viii) all real property interests; (ix) all interests in leaseholds, (x) all franchise rights; (xi) all patents, trade names, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property; (xii) all general intangibles; (xiii) all equity interests or capital stock, limited liability company interests, partnership interests and financial assets; (xiv) all investment property; (xv) all supporting obligations; (xvi) all letters of credit and letter of credit rights; (xvii) all commercial tort claims; (xviii) unearned premiums, refunds, and proceeds related to any insurance policies; (xix) all other claims and causes of action, including proceeds thereof (including, but not limited to, subject to entry of the Final DIP Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof); (xx) all books and records (including, without limitation, customers |

11

| BANKRUPTCY CODE/LOCAL RULE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | lists, credit files, computer programs, printouts and other computer materials and records); (xxi) to the extent not covered by the foregoing, all other assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxii) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing <br><br> The DIP Lender would be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim with priority over any and all administrative expense claims, unsecured claims, and all other claims against the Debtors or their estates in any of the Chapter 11 Cases. <br><br> The DIP Loan would be secured pursuant to Bankruptcy Code §364(c)(2), subject to the Carve-Out (as defined below), by a first-priority perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, not subject to a perfected lien or security interest on Petition Date; <br><br> The DIP Loan would be secured pursuant to Bankruptcy Code §364(c)(3), subject to the Carve-Out, by a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is subject to a valid, perfected, enforceable and unavoidable lien or security interest on the Petition Date or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Bankruptcy Code §546(b), in each case, that is permitted to be senior to the DIP Liens pursuant to the DIP Orders; and <br><br> The DIP Loan would be secured pursuant to Bankruptcy Code §364(d)(1), subject to the Carve-Out, by a first-priority, perfected senior secured priming lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is or was subject to a perfected lien or security interest on the Petition Date. <br><br> The DIP Liens would be effective and perfected as of the entry of the Interim DIP Order and without requiring the execution, filing or recording of mortgages, security agreements, pledge agreements, control agreements, financing statements or other agreements or instruments, or the taking of any action to obtain possession or control of any collateral.  However, the DIP Lender may require the execution, filing or recording of any or all of the documents described in the preceding sentence and/or the taking of any action so that the DIP Lender obtains possession or control of any collateral. <br><br> *See* Interim DIP Order, pp. 11–15; DIP Credit Agreement, § 1.1, 1.3, 4.1–4.2; 6.1. |

| BANKRUPTCY CODE/LOCAL RULE | SUMMARY OF MATERIAL TERMS |
|---|---|
| **Carve Out**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | The Carve-Out shall include: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a); (ii) prior to the delivery of a Carve Out Notice (defined below), to the extent allowed at any time by the Bankruptcy Court and subject to the Approved Budget, all accrued and unpaid fees and expenses incurred by professionals retained by the Debtors (collectively, the "**Retained Professionals**"); (iii) after the date of the delivery of a Carve Out Notice, to the extent allowed by the Bankruptcy Court and subject to the Approved Budget, all unpaid fees and expenses incurred by the Retained Professionals in an aggregate amount not to exceed $30,000.00.  For purposes of the foregoing, "**Carve Out Notice**" shall mean a written notice delivered by the DIP Lender to counsel to the Debtors, the United States Trustee, and lead counsel to any Official Committee, which notice may be delivered following the occurrence of a Termination Event.  All amounts of the Carve-Out that have not been funded as of the date of the Carve-Out Notice shall be required to be funded from the proceeds of the DIP Collateral.<br><br>Until the DIP Termination Date, the Debtors are authorized and directed, without further order of the Court and at the times provided below, to deposit into an account maintained by Debtors' counsel or other party designated by the Debtors an amount equal to the line items identified in the then applicable Approved Budget (collectively the "**Bankruptcy Fees**") under the line items for Retained Professionals (such account the "**Professional Fee Account**"), which amounts are part of the Carve-Out.  Upon entry of this Order, the initial funding into the Professional Fee Account shall be in an amount of one month of projected Bankruptcy Fees for the Retained Professionals.  Thereafter, the Debtors shall draw Bankruptcy Fees in advance of each draw on the DIP Facility.  Proceeds deposited into the Professional Fee Account shall be held for purposes of paying allowed fees and expenses of the Retained Professionals when allowed by order of this Court (as to which the parties' rights are expressly reserved.  Any portion of the Professional Fee Account not used to pay allowed fees and expenses of Retained Professionals shall be remitted to the Debtors' estates or their successor (subject to rights of the DIP Lender) after payment in full of all allowed fees and expenses of Retained Professionals which are part of the Carve-Out.  The foregoing amounts may be paid from the Professional Fee Account notwithstanding the DIP Termination Date (as defined in the DIP Credit Agreement) or the dismissal or conversion of these Chapter 11 Cases to pay to each Retained Professional to the extent<br><br>*See* Interim DIP Order, pp. 26–28. |

| BANKRUPTCY CODE/LOCAL RULE | SUMMARY OF MATERIAL TERMS |
|---|---|
| **Stipulations to Prepetition Liens and Claims**<br><br>**Bankruptcy Rule 4001(c)(1)(B)(iii)**<br><br>**Local Rule 4001- 2(a)(i)(B)** | None. |
| **Events of Default**<br><br>**Bankruptcy Rule 4001(c)(1)(B)**<br><br>**Local Rule 4001- 2(a)(ii)** | Usual and customary Events of Default for transactions of this type and others determined to be appropriate by the DIP Lender, in each case, that are satisfactory to the DIP Lender, including, without limitation, the following (subject to agreed exceptions and grace periods):<br><br>(a) Debtors shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise);<br><br>(b) Any Debtor fails or neglects to perform, keep or observe any term, provision, condition, covenant or agreement, in the DIP Credit Agreement, in any of the other Loan Documents, or in any other present or future agreement between Debtors and Lender;<br><br>(c) Any Debtor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or<br><br>(d) the entry of an order in the Chapter 11 Cases confirming a plan of reorganization or liquidation that does not contain a provision for the full payment of all obligations under the DIP Credit Agreement;<br><br>(e) the entry of an order amending, supplementing, staying, vacating, or otherwise modifying DIP Credit Agreement without the written consent of the DIP Lender;<br><br>(f) the Final DIP Order, in form and substance acceptable to Lender, is not entered promptly following the expiration of the Interim DIP Order;<br><br>(g) the Final DIP Order, in form and substance acceptable to Lender, is not entered on or before the date that is seventy-five (75) days after the entry of the Interim DIP Order;<br><br>(h) the appointment of a trustee or examiner in the Chapter 11 Cases (or Debtors apply for, consents to, or acquiesces in, any such relief);<br><br>(i) the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code (or Debtor applies for, consents to, or acquiesces in, any such relief);<br><br>(j) the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on any DIP Collateral, or (ii) with respect to any lien of or the granting of any lien |

| BANKRUPTCY CODE/LOCAL RULE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | on any DIP Collateral to any state or local environmental or regulatory agency or authority, which in either case is with respect to any portion of the DIP Collateral having a value, individually or in the aggregate, in excess of $25,000 or which would otherwise have a material adverse effect; |
| | **(k)** the commencement of a suit or action against the DIP Lender by or on behalf of a Debtor or its bankruptcy estate; |
| | **(l)** the breach of and/or failure of a Debtor to perform any of its obligations under the DIP Credit Agreement; or |
| | **(m)** the Bankruptcy Court or any other court of competent jurisdiction enters an order or judgment, or Debtors apply for, consent to, or acquiesce in, the entry of such order or judgment, in the Chapter 11 Cases modifying, limiting, subordinating or avoiding (i) the priority of any obligations owing to the DIP Lender under the DIP Credit Agreement, or (ii) the perfection, priority or validity of any lien securing such obligations. |
| | *See* DIP Credit Agreement, § 8.1. |
| **Waiver/Modification of the Automatic Stay**<br><br>**Bankruptcy Rule 4001(c)(1)(B)(iv)** | The automatic stay imposed by section 362(a) of the Bankruptcy Code shall be modified as necessary to permit:  (a) the Debtors to grant the DIP Liens and the superpriority claim, and to perform such acts as the DIP Lender may request, in its sole discretion, to assure the perfection and priority of the DIP Liens; (b) the Debtors to incur all liabilities and obligations, including all the DIP Obligations, to the DIP Lender as contemplated under this Order and the DIP Loan Documents; (c) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents, and the Interim DIP Order; (d) the DIP Lender to retain and apply payments made in accordance with the DIP Loan Documents and the Interim DIP Order; (e) subject to paragraph 19 of the Interim DIP Order, the DIP Lender to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein; and (f) the implementation of all of the terms, rights, benefits, privileges, remedies and provisions of the Interim DIP Order and the DIP Loan Documents, in each case, without further notice, motion or application to, or order of, or hearing before, the Bankruptcy Court.<br><br> *See* Interim DIP Order, pp. 17–18; DIP Credit Agreement, § 8.1. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>**Bankruptcy Rule 4001(c)(1)(B)(vii)** | The Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted therein, including, without limitation, the DIP Liens, without the necessity of execution, filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Lender to the priorities granted herein.  Notwithstanding the foregoing,  the |

| **BANKRUPTCY CODE/LOCAL RULE** | **SUMMARY OF MATERIAL TERMS** |
|---|---|
|  | DIP Lender, without any further consent of any party, shall be authorized to execute, file or record, and the DIP Lender may require the execution, filing or recording, as each, in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to enable the DIP Lender to further validate, perfect, preserve, and enforce the DIP Liens or other liens and security interests granted hereunder, perfect in accordance with applicable law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The Debtors shall be authorized and directed to execute and deliver promptly upon demand to the DIP Lender all such financing statements, mortgages, notices, and other documents as the DIP Lender may reasonably request.  The DIP Lender, in its discretion, may file a photocopy of the Interim DIP Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments. <br><br>*See* Interim DIP Order, pp. 18–19. |
| **Waivers and Releases** <br><br> **Bankruptcy Rule 4001(c)(1)(B)(viii)** | The DIP Obligations would not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash or otherwise treated as provided in the DIP Loan Documents, on or before the effective date of such confirmed plan of reorganization, or the DIP Lender has otherwise agreed in writing.   None of the Debtors may propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations in full in cash, or otherwise treated as provided in the DIP Loan Documents, on or prior to the earlier to occur of the effective date of such plan of reorganization or sale, without the written consent of the DIP Lender. <br><br> Nothing in the Interim DIP Order or in any of the DIP Loan Documents or any other documents related to this transaction may in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any and all activities by the Debtors in the operation of their businesses in connection with the Debtors' postpetition restructuring efforts. <br><br> In consideration of and as a condition to the DIP Lender providing the DIP Facility and other financial accommodations to the Debtors pursuant to the DIP Orders and the DIP Credit Agreement, each Debtor (each a "**Releasor**" and collectively, the "**Releasors**"), knowingly, intentionally, and intelligently waives (with the benefit of advice of legal counsel of their own choosing): (i) the right to trial by jury (which the DIP Lender also waives) in any action, suit, proceeding or counterclaim of any kind arising out of, related to or based in any way upon any of the DIP Loan Documents, the DIP |

16

| BANKRUPTCY CODE/LOCAL RULE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | Obligations, or the DIP Collateral; (ii) subject to the terms of the DIP Orders, presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper, and guaranties at any time held by the DIP Lender on which the Debtors may in any way be liable and hereby ratifies and confirms whatever the DIP Lender may do in this regard; (iii) subject to the terms of the DIP Orders, notice prior to taking possession or control of any of the DIP Collateral and the requirement to deposit or post any bond or other security which might otherwise be required by any court or applicable law prior to allowing lender to exercise any of DIP Lender's self-help or judicial remedies to obtain possession of any of the DIP Collateral; (iv) the benefit of all valuation, appraisement, and exemption laws; (v) any claim against the DIP Lender on any theory of liability, for direct, actual, special, indirect, consequential, exemplary or punitive damages arising out of, in connection with, or as a result of, (a) any prepetition acts, conduct, or transactions and (b) any of the loan documents, any transaction thereunder, the enforcement of any remedies by the DIP Lender or the use of any proceeds of any loans; (vi) notice of acceptance of the DIP Credit Agreement by the DIP Lender; and (vii) the right to assert any confidential relationship that it may have under applicable law with any accounting firm and/or service bureau in connection with any information requested by the DIP Lender pursuant to or in accordance with this agreement (and the Debtors agree that the DIP Lender may contact directly any such accounting firm and/or service bureau in order to obtain any such information). *See* Interim DIP Order, p. 31–32, 34–35; DIP Credit Agreement, § 9.9. |
| **Liens on Avoidance Actions** **Bankruptcy Rule 4001(c)(1)(B)(xi)** **Local Rule 4001-2(a)(i)(D)** | Subject to entry of the Final DIP Order, liens on claims and causes of action, including proceeds thereof (including, but not limited to, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof). *See* Interim DIP Order, pp. 11–12. |
| **Sections 506(c) and Section 552(c) Equities of the Case Waiver** **Bankruptcy Rule 4001(c)(1)(B)(iv), (x)** **Local Rule 4001-2(a)(i)(C), (H)** | Subject to entry of the Final DIP Order, no costs or expenses of administration shall be imposed against the DIP Lender or any of its Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and Borrowers hereby waive for themselves and on behalf of their estates in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Lender. *See* Interim DIP Order, pp. 30–31; DIP Credit Agreement, § 1.3(c). |
| **Credit Bid Rights** **Bankruptcy Rule** | The DIP Lender shall have the unqualified right to "credit bid" up to the full amount of the DIP Obligations, in connection with any sale or other disposition of all or any portion of the DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or |

ATL 22637303v5

| BANKRUPTCY CODE/LOCAL RULE | SUMMARY OF MATERIAL TERMS |
|---|---|
| 4001(c)(1)(B) Local Rule 4001- 2(a)(ii) | included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral, under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.<br><br>*See* Interim DIP Order, p. 31; DIP Credit Agreement, § 9.12. |
| No Priming or Pari Passu Liens<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001- 2(a)(ii) | No claim or lien having a priority superior to or *pari passu* with those granted by the Interim DIP Order to the DIP Lender shall be granted or allowed, subject only to the Carve-Out and liens securing the DIP Facility.<br><br>*See* Interim DIP Order, p. 14; DIP Credit Agreement, § 1.6. |

## Basis for Relief Requested

### A. Entering into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.

20.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and use Cash Collateral.   Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.   Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.   *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't*

18

*Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

21.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Teats.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a Debtors' business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the Debtors'] authority under the [Bankruptcy] Code").

22.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks. Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and

certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

23.     The Debtors' determination to move forward with the DIP Facility is an exercise of the Debtors' sound business judgment following careful evaluation of alternatives. Specifically, and in the face of limited cash on hand, the Debtors and their advisors determined that the Debtors would require substantial postpetition financing to support themselves during these Chapter 11 Cases pending the liquidation of their assets. Accordingly, the Debtors negotiated the DIP Loan Documents with the DIP Lender in good faith, and the Debtors believe that they have obtained the best financing available.

**B.  The Debtors Should Be Authorized to Obtain Postpetition Financing on a Secured, Superpriority, and Priming Basis**

24.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). See *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

25.     Courts have articulated a test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.      the credit transaction is necessary to preserve the assets of the estate; and

20

b.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-Debtor and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. at 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

26.    Based on current capital market conditions, after consultation with their advisors, the Debtors determined that postpetition financing on an unsecured basis would be unobtainable. Without postpetition financing, the Debtors will not be able to preserve and maximize the value of their estates. Absent sufficient financing to wind down their businesses during these Chapter 11 Cases and liquidate their assets, the value of the Debtors' estates would be substantially impaired to the detriment of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are fair, reasonable, and adequate.

27.    In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]." As described above, the Debtors are unable to obtain unsecured credit or credit on terms better than the DIP Facility. Therefore, approving the superpriority claim in favor of the DIP Lender is reasonable and appropriate. Further, section 364(c)(2) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by a lien on property of the estate that is not otherwise subject to a lien. In addition, section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or "priming" loans, provided that the debtor is otherwise unable to obtain credit and the primed creditor's interests are adequately protected. As the Debtors are unable to obtain the critical financing they need to administer these Chapter 11 Cases from any other source, the

21

Debtors respectfully represent that granting DIP Liens to the DIP Lender is warranted under the circumstances.

### C. No Comparable Alternative to the DIP Facility Is Reasonably Available.

28.     In satisfying the standards of section 364(c) and (d) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code.  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav.  Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085 at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b); finding that debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (element satisfied where "specialist in

22

commercial lending practices . . . explained that most banks lend money only in return for a senior secured position. The debtor cannot obtain financing secured by a lien on unencumbered property . . . because there is no property in the estate which is not already subject to a lien."). Generally, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). *See also In re Sky Valley, Inc.*, 100 B.R. at 112-13 (exhaustive search not required where the business suffered from financial stress, had little or no unencumbered property, and primary property was subject to numerous liens, and thus debtors' approach of only four lenders was sufficient under such circumstances).

29.    As noted above, after consulting with their advisors, the Debtors do not believe that alternative sources of financing on as favorable, or more favorable, terms are reasonably available. Thus, the Debtors have determined that the DIP Facility provides the best option forward under the circumstances to fund these Chapter 11 Cases. Therefore, the Debtors submit that the requirements of sections 364 of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

**D.  The DIP Lender Should Be Deemed a Good-Faith Lender under Section 364(e).**

30.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

23

31.    As explained herein and in the First Day Declaration, the DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

**E.  The Automatic Stay Should Be Modified on a Limited Basis.**

32.    The Debtors request that automatic stay imposed by section 362 be modified to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order or the Final DIP Order, as applicable.  Among other things, the proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender, to the extent necessary, to collect and apply payments and proceeds in respect of the DIP Collateral, as applicable, in accordance with the terms and provisions of the Interim DIP Order and the DIP Loan Documents.

33.    Such and similar stay modifications are commonplace and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases.  *See, e.g.*, *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg, LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010)

24

(same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del, Feb. 8, 2010) (same).

**F. Failure to Obtain the Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

34.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.   Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a Debtors' estates.

35.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors from and after entry of the Interim DIP Order until the Final Hearing to receive advances contemplated by the DIP Facility.   The Debtors require these advances prior to the Final Hearing and entry of the Final DIP Order to be able to continue to operate and pay administrative expenses.   This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to the estates and all parties in interest, pending the Final Hearing.

**Request for Final Hearing**

36.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

37.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a)

ATL 22637303v5

and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Consent to Jurisdiction**

38.     Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## **Notice**[6]

39.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee for the District of Delaware; (b) creditors holding the twenty largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (c) those parties requesting notice pursuant to Bankruptcy Rule 2002; (d) the Office of the United States Attorney for the District of Delaware; (e) the Office of the Secretary of State of the State of Delaware; (f) the Internal Revenue Service; and (g) the Securities and Exchange Commission.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion in accordance with the Local Rules.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

40.     Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with the Interim DIP Order, and notice of the Final Hearing, by first class mail upon the parties

---

[6]   Capitalized terms used in the Notice section but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

referenced in the foregoing section above.  The Debtors respectfully request that such notice is sufficient and requests that this Court find that no further notice of the Final Hearing and Final DIP Order is required.

## No Prior Request

41.    No prior Motion for the relief requested herein has been made to this or any other court.

## Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter an order granting the relief requested herein and granting the Debtors such other and further relief as is just and proper.

Dated: February 21, 2018

GREENBERG TRAURIG, LLP
*/s/ Dennis A. Meloro*
Dennis A. Meloro (DE Bar No. 4435)
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile  (302) 661-7360
Email:  melorod@gtlaw.com

-and-

John D. Elrod  (*pro hac vice pending*)
Benjamin R. Keck (*pro hac vice pending*)
3333 Piedmont Road, NE, Suite 2500
Atlanta, Georgia 30305
Telephone:  (678) 553-2259
Facsimile:  (678) 553-2269
Email:  elrodj@gtlaw.com
        keckb@gtlaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

ATL 22637303v5